# UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

NORMAN FREEMAN,    )
    )
    Petitioner,    )
    )    Case No. 15-0142-CV-W-ODS-P
    vs.    )
    )
JAY CASSADY,    )
    )
    Respondent.    )

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING THE ISSUANCE OF A CERTIFICATE OF APPEALABILITY

Petitioner, a convicted state prisoner currently confined at the Jefferson City Correctional Center in Jefferson City, Missouri, has filed *pro se* this federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2010 convictions and sentences for second-degree murder and armed criminal action, which were entered in the Circuit Court of Jackson County, Missouri. Petitioner's convictions were affirmed on direct appeal. Resp. Ex. E. Petitioner's motion for post-conviction relief filed pursuant to Mo. Sup. Ct. R. 29.15 was denied following an evidentiary hearing (Resp. Ex. G-2, pp. 17-49), and that denial was affirmed on appeal therefrom (Resp. Ex. L).

Petitioner raises sixteen (16) grounds for relief: (1) the evidence was insufficient to support his second-degree murder conviction, (2) trial counsel was ineffective for failing to ask petitioner on direct examination whether he had ever been present when the victim suffered nosebleeds, (3) trial counsel was ineffective for refusing the opportunity to have the trial court review the record to determine whether witness Aishah Holm testified as to whether the victim suffered from nosebleeds, (4) trial counsel was ineffective for calling petitioner's wife as a witness, (5) trial counsel was ineffective for failing to challenge the amended information on the basis that it failed

to set out the essential elements of second-degree murder, (6) direct appeal counsel was ineffective for failing to raise a claim of trial court error regarding the state's failure to disclose favorable evidence in a timely manner, (7) direct appeal counsel was ineffective for failing to challenge the information in lieu of indictment on the basis that it failed to provide essential facts that would place petitioner on proper notice of the second-degree murder charge, (8) trial counsel was ineffective for failing to file pretrial motions to exclude evidence relating to "the incised and stab wounds," (9) trial counsel was ineffective for failing to offer into evidence the recorded statement of witness Vesta Simmons and perform a full cross-examination of Simmons, (10) trial counsel was ineffective for failing to retain and call Thomas Young as a witness, (11) trial counsel was ineffective for failing to retain and call Ryan M. Rezzelle as a witness, (12) trial counsel was ineffective for failing to file a motion in limine concerning the uncharged crime of sexual assault, (13) trial counsel was ineffective for failing to request or submit a lesser included instruction of manslaughter, (14) trial counsel was ineffective for failing to file a pretrial motion seeking to exclude testimony from Jennifer Howard concerning any DNA testing that she did not perform, (15) trial counsel was ineffective for failing to request a continuance on the morning of Jennifer Howard's testimony, and (16) "trial counsel's representation as a whole" was prejudicial to the outcome of petitioner's case. Doc. No. 1, pp. 12-22. Respondent argues that Grounds 1-5 are without merit and that Grounds 6-16 are procedurally defaulted. Doc. No. 10, pp. 7-8.

## **STATEMENT OF FACTS**

In affirming petitioner's convictions and sentences, the Missouri Court of Appeals, Western District, set forth the following facts:

> On the evening of September 17, 2007, at approximately 7:15 p.m., Loraine Grayson was dropped off at her home in Jackson County by her friend, Leota Jones. After watching Grayson enter her home and lock her screen door, Jones drove away. Grayson did not answer Jones' phone calls later that evening, including a call made thirty minutes after Jones dropped Grayson at home.

2

Grayson's arrival home that evening was witnessed by a neighbor, Vesta Simmons, who was sitting in her boyfriend's car outside her home when Grayson returned. About twenty minutes later, Simmons saw Freeman, who lived next door to Grayson, exit his home and approach Grayson at her front door. Freeman asked Grayson to use her phone, even though Simmons could see that Freeman was wearing a cell phone on his hip. Simmons testified that Freeman entered Grayson's home. Simmons remained outside. She never saw Freeman exit Grayson's front door. Instead, she later observed him exit from the front door of his own house and talk with someone in a car which had pulled in front of his home, indicating that he had exited Grayson's house through a side or rear door and entered his own home in the same manner.

The next morning, Jones returned to Grayson's house to find the front screen door ajar and the newspaper still in Grayson's yard, suggesting something amiss. Jones contacted Grayson's granddaughter, Aishah Holm, who traveled from Lawrence, Kansas and arrived at Grayson's home within an hour. Upon entering, Holm found her grandmother's body on the living room floor in a pool of blood, her pants and underwear around her ankles. The door to the downstairs garage, which opened onto a backyard and was usually chain-locked, was unlocked and slightly ajar.

Holm called 911. Emergency responders initially concluded that the death was from natural causes, and funeral service personnel removed Grayson's body. Eventually, Holm's husband, brother, and six-month old son arrived on the scene. No one else entered the home on that day, though Freeman's wife did come to the front porch to express her condolences.

Holm later noticed items missing from the home, including Grayson's purse and a kitchen knife, and informed the police. An autopsy performed by the medical examiner's office revealed that Grayson had suffered an extensive list of injuries: a broken hyoid bone in her neck and petechial hemorrhages in her eyes, indicating strangulation; bruises and scrapes to her face, a fractured jawbone, a fractured cheek bone, and facial swelling, indicative of blunt force trauma to the face and head; three incised wounds to the neck; a stab wound to the carotid artery and trachea; and injuries to the vagina consistent with sexual assault. The cause of death was determined to be multiple blunt- and sharp-force injuries.

On the day after Grayson's body was discovered, the police interrogated Freeman. He admitted that he had ventured over to Grayson's home the previous evening and spoken with her about bugs or snakes in their yards; Freeman denied entering Grayson's home, however. He stated that he had worn his work shirt, burgundy shorts, and "flip-flop" sandals at the time, and that he possessed an operable cell phone and landline. He also admitted that he had borrowed money from Grayson in the past to feed his cocaine addiction.

3

A search warrant executed on Freeman's residence that day yielded a pair of men's flip-flop sandals, a pair of shorts and some shirts that Freeman may have been wearing on the previous day. Upon being informed during the interrogation that apparent blood was found on one of his flip-flop sandals, Freeman became upset, eventually remarking that, if he had killed Grayson, he would serve only seven years and be out in four.

During a further interview the next day, Freeman began weeping, declaring that Grayson's family deserved justice. When police asked whether he knew what had happened to Grayson, he remarked that he had been told by a friend of Grayson's, Everlean Brown, that Grayson's neck had been broken, a fact that was not known to anyone outside of the law enforcement community. Freeman also said that Grayson's pants had been down, a fact known only to law enforcement and Holm (and possibly the funeral personnel and other emergency responders) at the time. Photographs taken of Freeman that day showed lacerations on the inside of both hands and an abrasion on his cheek.

Forensic analysis of one of the flip-flop sandals revealed the presence of blood. The fact that the blood was evident only in crevices of the shoe implied that someone had attempted to remove the blood. Moreover, blood was also found on the shorts. Testing of the blood on the shorts was inconclusive, though neither Grayson nor Freeman could be ruled out as contributors. DNA testing of the blood on the sandal showed that it was a mix of Grayson's blood, and that of another, unidentified individual.

The State charged Freeman with one count of second degree murder and one count of armed criminal action. Following a jury trial at which Freeman testified, he was convicted of both offenses. The circuit court sentenced him to consecutive terms of life imprisonment and one hundred years for the murder and armed criminal action, respectively . . . .

Resp. Ex. E, pp. 2-5.

Before the state court findings may be set aside, a federal court must conclude that the state court's findings of fact lack even fair support in the record. *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983). Credibility determinations are left for the state court to decide. *Graham v. Solem*, 728 F.2d 1533, 1540 (8th Cir. en banc), *cert. denied*, 469 U.S. 842 (1984). It is petitioner's burden to establish by clear and convincing evidence that the state court findings are erroneous. 28 U.S.C. §

2254(e)(1).[1]  Because the state court's findings of fact have fair support in the record and because petitioner has failed to establish by clear and convincing evidence that the state court findings are erroneous, the Court defers to and adopts those factual conclusions.

<u>**PROCEDURAL DEFAULT OF GROUNDS 6-16**</u>

Petitioner argues that, although Grounds 6-16 were "abandoned by appointed counsel on appeal" from the denial of his Rule 29.15 motion, he filed *pro se* supplemental motions setting forth these claims in both the state appellate court and Missouri Supreme Court.  Doc. No. 1, p. 22.  Accordingly, petitioner argues that he has fairly presented Grounds 6-16 to the state courts and cites to *Clemmons v. Delo*, 124 F.3d 944, 953-55 (8th Cir. 1997).  Doc. No. 1, pp. 22.  In response, respondent argues that petitioner procedurally defaulted Grounds 6-16 by not asserting them in his post-conviction appeal.  Doc. No. 10, pp. 7, 28-31.  Respondent contends that, because the Missouri Court of Appeals, Western District, applied a specific and regularly applied court rule to reject petitioner's *pro se* filings, this case is distinguishable from *Clemmons*.  *Id*. at 30-31.

"A habeas petitioner is required to pursue all available avenues of relief in the state courts before the federal courts will consider a claim."  *Sloan v. Delo*, 54 F.3d 1371, 1381 (8th Cir. 1995), *cert. denied*, 516 U.S. 1056 (1996).  "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process" before presenting those issues in an application for habeas relief in federal court.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  "If a petitioner fails to exhaust state remedies and the court to which he should have presented his claim would now find it procedurally barred, there is a procedural default."  *Sloan*, 54 F.3d at 1381.  "Procedural default

---

[1] In a proceeding instituted by an application for writ of habeas corpus by a person in custody pursuant to a judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

5

of a claim under state law may constitute an independent and adequate state ground, but only if the state procedural rule is firmly established, regularly followed, and readily ascertainable." *White v. Bowersox*, 206 F.3d 776, 780 (8th Cir. 2000) (internal citations omitted).

Although petitioner cites *Clemmons* for the proposition that he has not procedurally defaulted Grounds 6-16, *Clemmons* is inapposite to the present case. In *Clemmons*, appellant filed a *pro se* motion for leave to file a supplemental brief in the Missouri Supreme Court, despite being represented by counsel. *Clemmons*, 124 F.3d at 948. The Missouri Supreme Court denied the *pro se* motion without comment. *Id.* In finding appellant's efforts sufficient to present his claims to the Missouri Supreme Court and therefore prevent procedural default, the *Clemmons* Court explained that the State failed to present a regularly-followed state rule prohibiting the filing of *pro se* briefs by represented parties and that Clemmons demonstrated that such briefs had been accepted by the Missouri Supreme Court in other cases. *Id.* at 954.

As opposed to the Missouri Supreme Court in *Clemmons*, the Missouri Court of Appeals, Western District, specifically cited Western District Special Rule XVI in a letter to petitioner as the basis for refusing to file his *pro se* supplemental brief. Resp. Ex. I, p. 1. "[E]ach district of the Missouri Court of Appeals has a local rule specifically forbidding *pro se* briefs or motions by counseled parties." *Manzella v. Dormire*, No. 4:07–CV–1528–CEJ, 2010 WL 3023969, at *2 (E.D. Mo. Aug. 2, 2010) (citing Special Rule 380 (Mo. Ct. App. E.D. 2000), Special Rule 6 (Mo. Ct. App. S.D. 1982), and Special Rule XVI (Mo. Ct. App. W.D. 2003)). For example, in *McGee v. State*, 821 S.W.2d 897, 898 (Mo. Ct. App. 1992), appellant attempted to add several "Points Relied On" to the brief his counsel filed on his behalf. In refusing to consider the merits of those claims, the Missouri Court of Appeals, Western District, held, "Where a litigant is represented by counsel, our local court rule (Western District Court of Appeals Special Rule XVI) does not allow the filing of a pro se brief, and movant's attempt at circumvention of that rule in this way will not

6

gain him a review of his pro se points." *Id.* The Missouri Court of Appeals, Eastern District, has similarly applied its local rule to refuse the filing of *pro se* briefs from appellants who were represented by appointed or retained counsel. *State v. Smith*, 886 S.W.2d 194, 198-99 (Mo. Ct. App. 1994) (citing *McGee*, 821 S.W.2d at 898)).

Here, petitioner filed his *pro se* brief with the state appellate court despite its "regularly followed and ascertainable" local rule prohibiting such filings. *See Manzella*, 2010 WL 3023969, at *2 (finding that petitioner procedurally defaulted his claims despite petitioner having filed a *pro se* brief with the Missouri Court of Appeals that was refused under local rule). Because Grounds 6-16 were not fairly presented on appeal from the denial of petitioner's Rule 29.15 post-conviction motion, Grounds 6-16 are procedurally defaulted. *Sweet v. Delo*, 125 F.3d 1144, 1149 (8th Cir. 1997) (recognizing that failure to present claims in the Missouri Courts at any stage of direct appeal or post-conviction proceedings is a procedural default), *cert. denied*, 523 U.S. 1010 (1998).

A federal court may not review procedurally defaulted claims "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Petitioner argues that "post-conviction appeal counsel's failure to comply with the State's procedural rules caused the default." Doc. No. 12, p. 1 (citing *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)). Although *Martinez* recognized that ineffective assistance of post-conviction counsel could constitute cause for the failure to raise a claim in an initial post-conviction proceeding, it did not change the rule that ineffective assistance of post-conviction appellate counsel could not constitute cause to excuse a state procedural default. *Arnold v. Dormire*, 675 F. 3d 1082, 1087 (8th Cir. 2012) (*Martinez* offers no support, however, for the contention that the failure to preserve claims on appeal from a postconviction proceeding can constitute cause."). Thus, *Martinez* does not apply, and petitioner

7

fails to establish cause for his procedural default. Petitioner fails also to show that a fundamental miscarriage of justice will result if his defaulted claims are not considered. *See Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir. 2006) (petitioner must present new evidence that affirmatively demonstrates that he is actually innocent of the crime for which he was convicted in order to fit within the fundamental miscarriage of justice exception), *cert. denied,* 549 U.S. 1036 (2006). As a result, Grounds 6-16 will be denied.

## GROUND 1

In Ground 1, petitioner argues that the evidence was insufficient to support his second-degree murder conviction. Doc. No. 1, p. 11. The Missouri Court of Appeals, Western District, denied Ground 1 as follows:

> There was sufficient evidence to support the jury's guilty verdicts. Freeman was the last person seen with Grayson, as Vesta Simmons, Grayson's neighbor, witnessed Freeman enter Grayson's home the evening of the murder. *See, e.g., State v. Harding,* 323 S.W.3d 810, 818-19 (Mo. App. W.D. 2010) (fact that defendant was the last person to see the victim alive supported murder conviction); *State v. Daniels,* 179 S.W.3d 273, 286 (Mo. App. W.D. 2005) (same). While Simmons did not see Freeman exit Grayson's home, she did later witness Freeman exiting his own house as he approached a car in front of his residence. Given that a door leading to Grayson's back yard and garage doors was unlocked and slightly ajar, the jury could infer that Freeman exited Grayson's house in an unusual and evasive manner, through her back yard, and entered his own home from a side or back door.

> According to Simmons' testimony, Freeman gained entrance to Grayson's home under the pretense of needing to use a phone. According to his own pre-trial statements, however, Freeman had a working landline, and a working cell phone, at the time. Freeman's use of a false excuse to gain entry to Grayson's home provides further evidence of his guilt.

> Freeman's own statements indicated that he had previously borrowed money from Grayson to purchase cocaine, to which he was addicted. The evidence indicates that Grayson's assailant beat and stabbed her to death, and then absconded with her purse. The evidence indicated that Freeman met a drug dealer later that evening in front of his house, although he denied purchasing the marijuana that the dealer offered.

8

The evidence also supports the inference that the perpetrator was someone acquainted with Grayson. Many of the witnesses, including Freeman, acknowledged that Grayson was security-conscious and prohibited strangers from entering her home. There were no signs of forced entry. Freeman was familiar enough with Grayson to have gained access to her home. Of course, Simmons' testimony establishes that Freeman in fact gained unforced entry to Grayson's home shortly before her murder.

In addition, another neighbor, Everlean Brown, testified that Freeman was skittish because of the police presence on the day Grayson's body was found. According to Brown, Freeman was pacing around outside, and repeatedly complained that "they" were looking at him. When asked by Brown who "they" were, he responded: "the police." Such nervous behavior could have been considered by the jury as evidence of consciousness of guilt. *See, e.g, State v. Nelson,* 777 S.W.2d 333, 336 (Mo. App. W.D. 1989) ("[The defendant's] manner of operating the car evidenced nervousness reasonably associated with the proximity of the following police vehicle and a consciousness of guilt").

The forensic evidence provides further support for the jury's verdict. Blood of Grayson and another unidentified individual was discovered on size eleven, men's flip-flop sandals found in Freeman's home. According to Simmons and Freeman himself, he was wearing flip-flop sandals when he visited Grayson.

Freeman offered evidence at trial in an attempt to explain away the DNA test results. The jury was not required to believe his explanations. *See, e.g., State v. Simpson,* 315 S.W.3d 79, 783 (Mo. App. W.D. 2010) ("This court 'does not determine credibility of witnesses, resolve conflicts in testimony, or weigh evidence, as these tasks are quite properly left to the jury.'" (citation omitted)). Freeman's proffered explanation was implausible in any event. Freeman's wife testified that she may have worn the sandals over to Grayson's house the day after the murder. But she was not confident in asserting that she had worn the sandals, recalling only that she had slipped on some shoes, and that she sometimes wore Freeman's sandals if they were handy. Further, Mrs. Freeman did not testify that she noticed, let alone came into contact with, any blood while visiting the Grayson house. Even assuming that she unwittingly walked through Grayson's blood on the morning after the murder, the State's trace evidence expert opined that the pattern of the blood stains on one of the sandals indicated that the blood had been airborne immediately before contacting the sandal, instead of being transferred directly from another surface. *See State* v. *Buchli,* 152 S.W.3d 289, 296 (Mo. App. W.D. 2004) (fact that defendant's clothes displayed impact blood spatter, *i.e.,* stains resulting from blood hitting the clothes with force, supported murder conviction).

In closing argument, defense counsel tried to explain the airborne nature of the blood by suggesting that the blood was being mopped up when Mrs. Freeman visited the home. However no one cleaning up the blood (Jones, Holm, or her husband), or even Mrs. Freeman herself mentioned mops being used. And even if mops were used, it seems doubtful that a mop would spatter blood, from a death

9

which had occurred hours earlier, onto the sandals of someone who never entered past the front porch. We also note that the expert testified that the small size of the stains indicated that the sandals must have been close to the blood source when the stains were made, and that Jones testified that the blood was fully dried by the time that clean-up began.

Of course, any alternative explanation as to the blood on Freeman's sandals would not explain the blood found on his shorts.

Freeman's own statements to detectives also provided damaging evidence against him. In his interviews, Freeman provided information that he could not have known unless he was the perpetrator. During the interrogation, Freeman claimed that he had been informed by Everlean Brown, a neighbor of Grayson's, that Grayson had been found with her pants around her ankles and a broken neck. However, Brown denied passing such information to Freeman, and also denied even knowing this information in time to have informed Freeman prior to the interrogation. The detectives and medical examiner on the case confirmed that this sensitive information had not been released to anyone outside of the law enforcement community, even family members. One of the detectives testified that law enforcement intentionally controlled the release of the crime scene information so that only the suspect would know the particulars of the crime. Regarding the broken neck, no one besides the law enforcement community knew this fact, including even Aishah Holm, who discovered the body. And even though she had seen that her grandmother's pants were lowered, Ms. Holm was the only person outside of law enforcement and possibly the funeral home personnel and emergency responders to know this fact at the time Freeman revealed it; she had not divulged that information to anyone save her husband, and only did so later that day after returning home.

Freeman attempted to counter the State's theory along multiple lines. Freeman argued that the crime scene had been compromised due to the initial belief that Grayson had died of natural causes, and that crucial evidence had been lost when Holm, her brother and her husband, and Jones cleaned the living room. He also attempted to impeach Simmons' testimony by noting both that she had received a $1000 award for the tip leading to Freeman's arrest and that her boyfriend, who had been with her at the time of her observations, had not been interviewed by the police to corroborate her version of events. But Freeman himself confirmed many essential elements of Simmons' testimony, admitting that he had been over to Grayson's house that evening, and that he had worn the clothes described by Simmons, including the flip-flop sandals. The absence of testimony from Simmons' boyfriend is not particularly probative because the defense could have interviewed and called him as easily as the State. *See, e.g., Porter v. Toys 'R' Us-Delaware, Inc.,* 152 S.W.3d 310, 318 (Mo. App. W.D. 2004) ("if the witness is equally available to both parties, it is improper for a party to argue such an adverse inference.").

To the extent that Freeman's pre-trial statements contradicted Simmons' testimony, the jury could find that his denials were false, and intended to conceal his guilt. Thus, Freeman testified that he simply spoke about bugs or snakes in the yard with Grayson that evening, and did not enter her home, but instead returned to his own residence directly from Grayson's front porch. The jury could not only choose to believe Simmons' contrary version, but could also reasonably find that Freeman's false testimony as to the reason for, and extent of, his visit to Grayson's home constituted important evidence of his consciousness of guilt. *See, e.g., State v. Perry,* 275 S.W.3d 237, 249 (Mo. banc 2009) ("The jury reasonably could have found that his attempted explanation false and that the false story showed consciousness of guilt rather than innocence."); *State v. Tremaine,* 315 S.W.3d 769, 776 (Mo. App. W.D. 2010) (same). In his trial testimony Freeman also denied making statements to police about receiving a seven-year sentence if he had killed Grayson, or reflecting his knowledge that Grayson had been found with her pants around her ankles. Given the testimony that he had, in fact, made these statements, the jury could have concluded that Freeman's denials were also lies intended to minimize his guilt.

The jury was not required to believe Freeman's exculpatory evidence. Sufficient evidence was presented from which the jury could find that Freeman entered Grayson's home and, with the purpose of causing serious injury to her with a knife, caused her death. The trial court did not err in denying his motion for acquittal at the close of all of the evidence. Point denied.

Resp. Ex. E, pp. 6-11 (footnotes omitted).

When a court is reviewing a sufficiency of the evidence claim, the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "In applying this standard, '[t]he scope of our review for a collateral challenge to the sufficiency of the state's evidence is extremely limited . . . We must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state, and we must defer to that conclusion.'" *Sexton v. Kemna*, 278 F.3d 808, 814 (8th Cir. 2002) (citing *Miller v. Leapley*, 34 F.3d 582, 585 (8th Cir. 1994)), *cert. denied*, 537 U.S. 886 (2002). "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original).

11

The evidence presented at petitioner's trial is sufficient to support petitioner's convictions under the foregoing standards. As the state appellate court explained, evidence was presented at trial that petitioner was the last person seen with the victim, used false pretenses to gain entry into the victim's home, exhibited nervous behavior around the police after the victim's body was discovered, had the victim's blood on flip-flop sandals found in his home, and provided incriminating statements to police. Resp. Ex. E, pp. 6-11. Petitioner admits in his reply that, from the evidence at trial, "the State Court could reasonably hypothesize that . . . after entering Ms. Grayson's home, petitioner beat and stabbed Ms. Grayson to death, and exited the home by another door to keep from being seen, and that he later lied to conceal his guilt." Doc. No. 12, p. 7. Instead, petitioner argues that the possibility that the victim's death was accidental is "[j]ust as compatible" with the evidence and that "there was no evidence presented on the essential element of intent." *Id.* at 7, 11. Petitioner's analysis, however, ignores the standard set forth above, where all inferences are drawn in favor of the state. *Sexton*, 278 F.3d at 814.

As a result, the finding of the Missouri Court of Appeals is reasonable, entitled to deference, and supported by the record. Because the appellate court's ruling did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *see* U.S.C. § 2254(d)(1) and (2), Ground 1 will be denied.

## GROUNDS 2-5

In petitioner's remaining grounds, petitioner asserts four claims of ineffective assistance of trial counsel. In Ground 2, petitioner argues that trial counsel was ineffective for failing to ask petitioner on direct examination whether he had ever been present when the victim suffered nosebleeds. Doc. No. 1, pp. 11-12. In Ground 3, petitioner argues that trial counsel was

12

ineffective for refusing the opportunity to have the trial court review the record to determine whether witness Aishah Holm testified as to whether the victim suffered from nosebleeds. Doc. No. 1, pp. 12-13. In Ground 4, petitioner argues that trial counsel was ineffective for calling petitioner's wife as a witness. Doc. No. 1, pp. 13-14. In Ground 5, petitioner argues that trial counsel was ineffective for failing to challenge the amended information on the basis that it failed to set out the essential elements of second-degree murder. Doc. No. 1, p. 14.

In order for petitioner to successfully assert a claim for ineffective assistance of trial counsel, petitioner must demonstrate that his attorney's performance "fell below an objective standard of reasonableness" and that "the deficient performance" actually prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). This Court, moreover, may not grant habeas relief unless the state appellate court's decision "was contrary to, or an unreasonable application of, the standard articulated by the [United States] Supreme Court in *Strickland*." *Owens v. Dormire*, 198 F.3d 679, 681 (8th Cir. 1999), *cert. denied*, 530 U.S. 1265 (2000).

"A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689). Petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

In affirming the denial of petitioner's post-conviction motion, the Missouri Court of Appeals, Western District, denied Grounds 2-5 as follows:

> In Point I [Ground 2], Freeman argues that his trial counsel was ineffective for failing to ask him on direct-examination whether he had ever been in the presence of Grayson when she suffered a nosebleed. Freeman contends that providing the jury with a plausible, alternative reason as to how Grayson's blood came to be on his shoe was critical to his defense and that by failing to ask him about nosebleeds, the jury was left without an exculpatory explanation.

13

In Point II [Ground 3], Freeman argues that his trial counsel was ineffective for failing to request the court to review the trial record during closing arguments to confirm that Holm had testified that her grandmother (Grayson) had nosebleeds on occasion. Freeman alleges that, after the court sustained the State's objection to his counsel's argument that the blood found on Freeman's shoe could have been deposited during one of Grayson's nosebleeds, his counsel was ineffective for failing to ask the court to stop arguments and review the record so that counsel would be allowed to make this argument to the jury.

Because Points I and II are based on the premise that additional testimony or references to nosebleeds would have established a plausible, alternative reason as to why the victim's blood was found on Freeman's shoe, we review these points together for ease of analysis.

. . . .

To be entitled to post-conviction relief for ineffective assistance of counsel, the movant must satisfy a two-prong test. *Glaviano v. State*, 298 S.W.3d 112, 117 (Mo. App. W.D. 2009) (citation omitted). Freeman must prove by a preponderance of the evidence: (1) that his counsel's performance did not conform to the degree of skill, care and diligence of a reasonably competent attorney; and (2) that Freeman was thereby prejudiced. *Henderson*, 398 S.W.3d at 577 (citations omitted). *See also Strickland* [466 U.S. at 687]. To establish the performance prong, Freeman bears a heavy burden and "must overcome a strong presumption that [his] counsel provided competent assistance." *Henderson*, 398 S.W.3d at 577 (citing *Deck v. State*, 68 S.W.3d 418, 425 (Mo. banc 2002)). "We judge the reasonableness of counsel's conduct based on the facts of each case." *Henderson*, 398 S.W.3d at 577 (citing *Williams v. State*, 205 S.W.3d 300, 305 (Mo. App. W.D. 2006)).

We reach the prejudice prong only if the movant has proved that his counsel's performance fell below the degree of skill, care and diligence of a reasonably competent attorney. *Henderson*, 398 S.W.3d at 577 (citations omitted). *See also Strickland*, 466 U.S. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Henderson*, 398 S.W.3d at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Because our standard of review is the same for all four points, it will not be repeated under each point.

Freeman argues that the trial court erred when it denied his post-conviction relief ("PCR") motion based upon his trial counsel's failure to ask him on direct examination whether he had ever been in Grayson's presence as she suffered a nosebleed. Freeman claims that this was crucial to his defense because he had intended to testify that he had in fact been with Grayson when she had a nosebleed and that this could explain how her blood got on his shoe.

14

At the evidentiary hearing on Freeman's PCR motion, Freeman's trial counsel testified regarding her performance at trial. She asserted that proving alternative explanations for how the blood got on Freeman's shoe was critical to her defense strategy. She stated that she had specifically asked an earlier witness, Holm, whether Grayson ever had nosebleeds so as to set up further testimony on that subject from Freeman. She then stated that she simply "forgot" to bring it up in his direct examination, and that it "was a huge mistake . . . not trial strategy at all. Somehow the biggest part, I just forgot somehow." In fact, on redirect examination of Freeman, trial counsel did ask him about Grayson's nosebleeds, but the State's objection to the question was sustained because the question went beyond the scope of the State's cross-examination of the witness. Based on Freeman's testimony at trial and at the motion hearing, his testimony, had he been asked and allowed to answer, would have been that at some prior occasion he had been in Grayson's presence when she had a nosebleed. There was no testimony that tied this nosebleed in any way to the time period reasonably preceding the murder and no testimony that any of Grayson's blood actually ended up on his sandal from this prior nosebleed.

As to this point of claimed error, the motion court found that "the fact that [defense counsel] did not question Movant on this issue during direct examination, was, at most, a tactical error." We note that it is the trial court's job to either believe or disbelieve witness testimony at an evidentiary hearing and we defer to its determination of credibility. *Jones v. State*, 773 S.W.2d 156, 158 (Mo. App. E.D. 1989). In determining credibility, "the motion court should make every effort to eliminate the distortion wrought by hindsight and to evaluate the challenged conduct from counsel's perspective at the time of the conduct." *Id.*

The motion court found the failure to ask Freeman about the nosebleeds to be a tactical error. "Tactical errors do not establish ineffective assistance of counsel." *McFarland v. State*, 338 S.W.3d 846, 850 (Mo. App. S.D. 2011) (citations omitted). The motion court quoted *McFarland*, which held that "trial counsel is not judged ineffective constitutionally simply because in retrospect his or her decision may seem to be an error in judgment." 338 S.W.3d at 850. The "characterization of trial counsel's performance does not give the necessary deference to the motion court's judgment." *Francis v. State*, 183 S.W.3d 288, 302 (Mo. App. W.D. 2005).

Although trial counsel testified that her failure to ask Freeman about nosebleeds was not a tactical decision but solely a mistake, had the court made findings consistent with this, Freeman would still have to show how this mistake prejudiced him. "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *State v. Zink*, 181 S.W.3d 66, 73 (Mo. banc 2005). Here, trial counsel represented to the motion court that, if asked, Freeman would have testified that he had once been with Grayson when she had a nosebleed, but that it was approximately a year before the murder. This testimony, without tying it in closer proximity to the date

Case 4:15-cv-00142-ODS   Document 13   Filed 05/21/15   Page 15 of 23

of the murder and without some testimony that he noticed blood from this nosebleed on his foot or on his sandal (or even that he was wearing these same sandals at the time of the nosebleed), would have little or no potential effect on the outcome of the trial. In light of the proffered testimony, Freeman has failed to establish that he was prejudiced by his counsel's failure to elicit this testimony from him.

Freeman's second claim of error involving evidence of nosebleeds stems from trial counsel's closing argument. Freeman's trial counsel argued the following:

> Trial Counsel: You've got three good reasons as to why Mrs. Grayson's blood might be on his shoe. You heard that Mrs. Grayson had nosebleeds from time to time.

> State: Objection.

> [Discussion at the bench]:

> Court: My recollection is that it was stricken in terms of specific comments. Now the Court does not recall Ms. Holm testifying about the nosebleeds. If we need to stop and check the record, we can do that. But it's my recollection to both items, the evidence is not in.

> Trial Counsel: She did. I know she did. That's obviously a big part of my case. I definitely made sure that I got that out of her.

> Court: I will tell you that my recollection is that it is not in evidence. If you intend to argue it, then we need to send the jury out so we can check the record. Because candidly, if you intend to argue that, the Court's recollection is, it's not in evidence. I'm not going to let you do that.

> Trial Counsel: I really don't want to break this up. That's fine. I will not talk about nosebleeds again. Thank you. I understand all of the options and I would like to go on. TR 1057-59

A review of the transcript reveals that Freeman's trial counsel had, in fact, elicited this testimony from Holm:

> Trial Counsel: And do you know whether or not your mother ever got nosebleeds from time to time?

> Holm: Every once in a while she would. TR 358

With regard to the decision not to stop the trial in the middle of closing argument to have the court reporter locate this testimony, trial counsel testified at the motion hearing that this was another "mistake." She went on to say that she

16

"mistakenly decided not to have him go back and look." She ended by concluding that she "should have" taken the break.

As to this alleged error by counsel, the motion court held that trial counsel's decision not to stop closing argument and ask the court to find the testimony in the trial record was a "tactical decision." The court further noted that considering the situation, trial counsel "chose what she believed was in the best interests of her client. This was a decision by [Trial Counsel] that was appropriately made in the exercise of her professional judgment." The motion court again cited *McFarland* in support. 338 S.W.3d at 850.

As noted above, trial counsel told the court that she "understood all of the options and would like to go on." This is a clear example of a strategic decision made under the pressure of trial. "No matter how ill-fated it may appear in hindsight, a reasonable choice of trial strategy cannot serve as a basis for a claim of ineffective assistance of counsel." *Johnson v. State*, 406 S.W.3d 892, 900 (Mo. banc 2013) (citation omitted). Certainly counsel who is in the middle of a closing argument does not want the flow of the argument to be disrupted by an extended recess. Her decision that the detriment from such a disruption would outweigh the benefit of being able to reiterate Holm's testimony that the victim had "occasional nosebleeds," without further evidence to tie these nosebleeds to the defendant or his sandal, is a trial strategy decision.

In addition, we note that during trial counsel's closing argument, she referenced that there were "three good reasons as to why Mrs. Grayson's blood might be on his shoe." The reference to nosebleeds was only one of them, leaving her to argue two other explanations in defense of the blood found on Freeman's shoe, which she subsequently did. During her closing, counsel argued that the blood could have gotten on the sandal when Mrs. Freeman wore the sandals across the street to offer her condolences to Grayson's family during the cleanup of the murder scene. She also argued that because a bloody carpet was drug across the front yard to the curb, Freeman could have walked through the grass and gotten blood on his sandal after that occurred.

Based on the foregoing, we do not find that Freeman has proven by a preponderance of evidence that his counsel's performance regarding the nosebleed testimony failed to "conform to the degree of skill, care and diligence of a reasonably competent attorney." *Glaviano*, 298 S.W.3d at 117. Freeman bears a heavy burden and "must overcome a strong presumption that his counsel provided competent assistance." *Henderson*, 398 S.W.3d at 577 (citing *Deck*, 68 S.W.3d at 425). As such, Freeman has not met the first prong of the two-prong test. *Glaviano*, 298 S.W.3d at 117. We reach the prejudice prong only if the movant has proved that his counsel's performance fell below the degree of skill, care and diligence of a reasonably competent attorney. *Henderson*, 398 S.W.3d at 577 (citations omitted).

Points I and II are therefore denied.

17

In Point III [Ground 4], Freeman alleges that his trial counsel was ineffective for calling Freeman's wife to testify on his behalf. Freeman claims this was error because on cross-examination, his wife was questioned by the State about a police report she had filed regarding a burglary of her home. She testified the burglary was during a period of separation from Freeman and that she had reported Freeman as a suspect.

"The selection of witnesses and evidence are matters of trial strategy, virtually unchallengeable in an ineffective assistance claim." *Johnson*, 406 S.W.3d at 900. "The question in an ineffective assistance claim is not whether counsel could have or even, perhaps, should have made a different decision, but rather whether the decision made was reasonable under all the circumstances." *Id.* at 901.

At the evidentiary hearing, trial counsel testified that she had called Mrs. Freeman because she was an employed, church-going witness who could testify as to Freeman's demeanor and activities both before and after the alleged time of the murder. Counsel stated that the main reason she called Mrs. Freeman was to talk about Freeman's behavior the evening of the murders. Mrs. Freeman also testified that she had thrown on some sandals and gone across the street on the day after the murder, which trial counsel argued could be another innocent explanation for how the victim's blood got on Freeman's sandals.

Trial counsel was aware that Freeman was a suspect in the burglary which was reported by Mrs. Freeman. She indicated it was possible that she had received a copy of the police report prior to putting Mrs. Freeman on the stand but also possible that she did not review it thoroughly. She agreed that evidence of a burglary report in which Freeman was the suspect could only have come in during an impeachment of Mrs. Freeman; otherwise, it could not have come into evidence. However, despite this adverse testimony in Mrs. Freeman's cross-examination, trial counsel testified that, overall, Mrs. Freeman provided the information that counsel had hoped to elicit from her.

The motion court determined that trial counsel's decision to call Mrs. Freeman was one of trial strategy and a tactical decision. It further noted that since the evidence of Grayson's blood on Freeman's sandal was damaging to his case, "anything that trial counsel could do to combat that evidence was sound trial strategy," including calling Mrs. Freeman to testify that she may have worn Freeman's sandals over to the scene of the crime as the blood was being cleaned up. It was also sound strategy to have Mrs. Freeman testify that Freeman acted normally both before and after the time of the crime and that he did not appear to be under the influence of drugs. We find that the positive testimony that Mrs. Freeman provided far outweighed any negative impact the testimony regarding a burglary where Freeman may have been a suspect. In fact, since Freeman's extensive criminal history was presented to the jury during his testimony, it was reasonable for trial counsel to believe that this one additional event would have had little or no impact on the outcome of the proceedings. Calling Mrs. Freeman was a

Case 4:15-cv-00142-ODS   Document 13   Filed 05/21/15   Page 18 of 23

reasonable choice of trial strategy and cannot serve as a basis for a claim of ineffective assistance of counsel. *Johnson*, 406 S.W.3d at 900 (citation omitted).

Based on the foregoing, we do not find that Freeman has proven by a preponderance of evidence that trial counsel's decision to call Mrs. Freeman to testify about her wearing of the sandals as well as about Freeman's behavior and demeanor on the evening of the murder was unreasonable. Freeman bears a heavy burden and "must overcome a strong presumption that his counsel provided competent assistance." *Henderson*, 398 S.W.3d at 577 (citing *Deck*, 68 S.W.3d at 425). As such, Freeman has not met the first prong of the two-prong test. *Glaviano*, 298 S.W.3d at 117. We reach the prejudice prong only if the movant has proved that his counsel's performance fell below the degree of skill, care and diligence of a reasonably competent attorney. *Henderson*, 398 S.W.3d at 577 (citations omitted).

Point III is denied.

In Point IV [Ground 5], Freeman contends that his trial counsel "failed to challenge the amended information and failed to move to dismiss the charges against Mr. Freeman, in that the amended information was insufficient because it failed to include . . . any allegation that the person charged with the offense caused the death of another."

When an information or indictment is challenged for the first time after a verdict, such "will be deemed insufficient only if it is so defective that (1) it does not by any reasonable construction charge the offense of which the defendant was convicted or (2) the substantial rights of the defendant to prepare a defense and plead former jeopardy in the event of acquittal are prejudiced." *State v. Briscoe*, 847 S.W.2d 792, 794 (Mo. banc 1993) (quoting *State v. Parkhurst*, 845 S.W.2d 31, 35 (Mo. banc 1992)). "In either event, a defendant will not be entitled to relief based on a post-verdict claim that the information or indictment is insufficient unless the defendant demonstrates actual prejudice." *Id. Briscoe* also involved a review of a Rule 29.15 post-conviction judgment. *Id.* at 793.

On October 19, 2007, the State filed an indictment charging Freeman with one count of murder in the second degree and one count of armed criminal action. The charge of second degree murder included that Freeman "committed the Class A Felony of Murder in the Second Degree . . . in that . . . the defendant with the purpose of causing serious physical injury to Lorraine Grayson caused the death of Lorraine Grayson by stabbing her."

On October 30, 2009, two years later, the State amended the indictment to include the requisite factual allegations that Freeman was a prior and persistent offender. The previously charged counts of murder in the second degree and armed criminal action were still present and remained unchanged except that the words "caused the death of" were omitted from the murder charge. Trial began a few days later.

19

"The reason that Rule 23.01 requires a litigant to plead essential facts in an information is to enable a defendant to prepare for trial and to establish that he has been twice put in jeopardy for an offense." *State v. Brink*, 218 S.W.3d 440, 447 (Mo. App. W.D. 2006) (citing *Briscoe*, 847 S.W.2d at 794-95)). Freeman "does not contend that he could not prepare a defense, nor do we discern any sound basis for his making such a contention." *Id.* Freeman knew he was charged with the murder of Grayson, as his trial testimony plainly conveys:

Trial Counsel: Norman, did you kill Mrs. Grayson?

Freeman: No, I didn't. TR 960

Here, Freeman asserts only that the information "excluded an essential element of second degree murder" and "as such, the amended information was insufficient and trial counsel was ineffective for failing to challenge" the information. However, inherent in the definition of "murder" is the death of a person.

In denying Freeman's claim that his counsel was ineffective for not challenging the information, the motion court correctly relied, in part, on *State v. Perkins* which held that "no indictment or information will be declared invalid, nor the judgment set aside, because of a defect which does not prejudice the substantial rights of the defendant." 831 S.W.2d 637, 639-40 (Mo. App. W.D. 1992). The motion court also based its reasoning on the testimony of trial counsel at the evidentiary hearing. There, when asked to review the information and questioned about its sufficiency, counsel testified that she did not notice any deficiencies in it and that she "still [doesn't] know what the problem is . . . ." Although trial counsel admitted that she had not noticed that the language of "causing the death of" was missing from the amended indictment, she nonetheless knew what the charges were against her client. The motion court concluded that the omission of the words did not prejudice Freeman because it did not affect his defense.

Despite the fact that trial counsel did not notice the missing language, Freeman still cannot succeed on his claim because the information sufficiently informed Freeman and his counsel of the charge such that his substantial rights to prepare a defense were not hindered. *See Parkhurst*, 845 S.W.2d at 35. Freeman had over two years to prepare his defense under the original indictment which properly included the phrase "caused the death of" Lorraine Grayson. The subsequent error by the State in deleting this language from the amended information had no effect on Freeman's defense and he points us to none. We find no error in the motion court's denial of his claim of ineffective assistance of counsel for failing to object to the information.

Point IV is denied.

Resp. Ex. L, pp. 7-20 (footnotes and headings omitted).

The findings of the Missouri Court of Appeals, Western District, as to petitioner's claims of ineffective assistance of trial counsel are reasonable and are entitled to deference under Section 2254(d). In holding that petitioner's ineffective assistance of trial counsel claims did not merit post-conviction relief, the state appellate court identified and applied reasonably the *Strickland* standard. Resp. Ex. L, pp. 7-20. "'Surmounting *Strickland's* high bar is never an easy task.'" *Harrington*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* "The standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Id.* (internal quotations and citations omitted). Accordingly, a habeas petitioner must show that there is no "reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* Petitioner fails to make such a showing.

As to the state appellate court's finding that petitioner was not prejudiced by trial counsel's failure to ask him during direct examination whether he had been in the victim's presence while she had a nosebleed, "[i]n order to determine if particular testimony might reasonably have led to a different result at trial, as *Strickland* requires, the district court must consider the strength of the offered testimony relative to the strength of the State's case." *Lawrence v. Armontrout*, 31 F.3d 662, 667 (8th Cir. 1994), *cert. denied*, 513 U.S. 1161 (1995). As set forth in this Court's denial of Ground 1, the State's evidence tended to establish that petitioner was the last person seen with the victim, used false pretenses to gain entry into the victim's home, exhibited nervous behavior around the police after the victim's body was discovered, had the victim's blood on flip-flop sandals found in his home, and provided incriminating statements to police. *See* Resp. Ex. E, pp. 6-11. As a result, the strength of the State's evidence was such that petitioner's testimony that he was in the victim's presence at some unspecified time when she had a nosebleed would not have

reasonably affected the outcome of his trial. Moreover, as the state appellate court explained, trial counsel offered two other explanations for the existence of the victim's blood on petitioner's shoe. Resp. Ex. L, pp. 12-14. Consequently, the state appellate court made a reasonable determination in finding that petitioner was not prejudiced by trial counsel's failure to elicit testimony from petitioner as to the victim's nosebleeds.

Furthermore, insofar as the state appellate court denied Grounds 3 and 4 due to trial counsel's reasonable trial strategies, "courts must resist the temptation to second-guess a lawyer's trial strategy; the lawyer makes choices based on the law as it appears at the time, the facts as disclosed . . . and his best judgment as to the attitudes and sympathies of judge and jury." *Blackmon v. White*, 825 F.2d 1263, 1265 (8th Cir. 1987); s*ee also Shaw v. U.S.*, 24 F.3d 1040, 1042 (8th Cir. 1994) (trial counsel's reasonable trial strategies cannot constitute ineffective assistance, even if they are unsuccessful); *Henderson v. Norris*, 118 F.3d 1283, 1287-88 (8th Cir. 1997) (matters of trial strategy presumed correct), *cert. denied*, 522 U.S. 1129 (1998).

Because the state court's determinations did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *see* 28 U.S.C. §2254(d)(1) and (2), Grounds 2-5 will be denied.

## CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. § 2253(c), the Court may issue a certificate of appealability only "where a petitioner has made a substantial showing of the denial of a constitutional right." To satisfy this standard, a petitioner must show that a "reasonable jurist" would find the district court ruling on the constitutional claim(s) "debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 276 (2004). Because petitioner has not met this standard, a certificate of appealability will be denied. See 28

U.S.C. § 2254, Rule 11(a).

Accordingly, it is **ORDERED** that:

(1) the petition for writ of habeas corpus is denied; and

(2) this case is dismissed with prejudice.

 /s/ Ortrie D. Smith
ORTRIE D. SMITH
UNITED STATES DISTRICT JUDGE

Kansas City, Missouri,

Dated: May 21, 2015.